# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GEORGE N. NASKARIS, PH.D.<br><br>                      Plaintiff,<br><br>      -against-<br><br>THE HON. KYRIAKOS K. MITSOTAKIS,<br>THE HON. DIMITRIS AVRAMOPOULOS,<br>THE HON. ADONIS A. GEORGIADIS,<br>THE HON. ANTONIS K. SAMARAS,<br>THE HON. MARIOS G. SALMAS,<br>THE HON. IOANNIS A. STOURNARAS,<br><br>                    Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff George N. Naskaris, Ph.D. ("Plaintiff" or "Dr. Naskaris"), personally, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of his previous counsel, Frank R. Schirripa, who, for reasons already known to the court, withdrew CASE NO. 1:24-cv-30401 without prejudice, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    This is an action brought by Plaintiff against Kyriakos K. Mitsotakis, Greek Prime Minister ("the Prime Minister" or "Mr. Mitsotakis"); Dimitris L. Avramopoulos, Member of Parliament and former Defense and Foreign Affairs Minister; Antonis K. Samaras ("Mr. Samaras"), Member of Parliament and former Prime Minister; Adonis A. Georgiadis ("Mr. Georgiadis"), Health Minister; Marios G. Salmas ("Mr. Salmas"), Member of Parliament and former Deputy Health Minister; and Ioannis A. Stournaras ("Mr. Stournaras"), Chairman, Bank of Greece and former Greek Finance Minister (hereinafter Messrs. Avramopoulos, Georgiadis,

**RECEIVED**

JUL 0 2 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1

Salmas, Samaras, and Stournaras may be jointly referred to as "the Five Officials" and all defendants collectively as "Defendants") for tortious interference with an existing contract, corruption, witness tampering ( 18 U.S.C. § 1512), violations of the Foreign Extortion Prevention Act (FEPA – 18 U.S.C. § 1352) and/or fraudulent enrichment.

2.     Dr. Naskaris organized and effectuated a whistleblower group to bring Novartis AG, Novartis Hellas S.A.C.I., and related entities (collectively "Novartis") to justice for their corruption, bribery, and violations of the Foreign Corrupt Practices Act ("FCPA").

3.     Between November of 2014 and May of 2016 Dr. Naskaris recruited attorneys and whistleblowers in order to build and bring a whistleblower action to the U.S. Securities and Exchange Commission ("SEC") against Novartis ("the Novartis Case").

4.     In his efforts to bring Novartis to Justice, Dr. Naskaris recruited two attorneys: Pavlos K. Sarakis ("Mr. Sarakis"), owner and sole partner of the Sarakis & Associates Athens law firm ("Sarakis Law Firm"), and Andrew Beato ("Mr. Beato"), partner at the Stein Mitchell Cipollone, Beato and Missner LLP Washington, DC, law firm ("Stein Mitchell").  The name has since changed and is currently Stein Mitchell Beato and Missner LLP.

5.     As the whistleblower group grew, the various parties entered into a series of contracts. The earliest contract is dated November 25, 2014, and the last is dated May 13, 2016.

6.     The whistleblower group contracts stated the parties to the contract, the roles of the parties, and the agreed upon split of any potential whistleblower award to each of the parties that could be paid based upon the work of the whistleblower group.

7.     On August 12, 2016, the whistleblower group, which, in addition to Mr. Sarakis and Mr. Beato, included Whistleblower A, Whistleblower B and Whistleblower C, completed and filed their complaint form with the SEC's tips, complaints, and referrals (TCRs) system.

8.      On or about October 20, 2016, Mr. Sarakis and Whistleblowers A, B and C terminated their contract for services with Stein Mitchell and, in violation of the contracts dated November 15, 2014 and May 13, 2016, without informing Dr. Naskaris, engaged new counsel.

9.      Dr. Naskaris made repeated efforts to find the name of the new counsel, but Mr. Sarakis didn't respond to Plaintiff's requests.

10.      On June 25, 2020, the SEC and DOJ announced massive settlements of $340 million to resolve FCPA violations against Novartis. On August 4, 2023, the SEC announced it was providing $104 million as whistleblower award (the "Whistleblower Award") marking it the fourth largest whistleblower award of all time.

11.      Based on Plaintiff's calculations, of the $340 million settlement, appr. 80%, or $270 million, was for FCPA violations perpetrated by Novartis in Greece and the other 20% for violations perpetrated by Novartis AG and/or its subsidiaries in the Far East.

12.      Sometime in 2023, Plaintiff found out that after the TCR was filed on August 12, 2016, without informing Dr. Naskaris as was required by existing contracts, but following confidential and proprietary information provided by Plaintiff, Mr. Sarakis had found a fourth whistleblower, Maria Marangeli, who is not party to any agreement with Plaintiff.

13.      Part of the evidence used in building the Novartis Case was appr. $50 million in cash, stuffed in suitcases,  paid to ten Greek Prime Ministers, Finance Ministers, Health Ministers and other high level public officials ("the Ten Officials").

14.      Messrs. Georgiadis, Avramopoulos, Salmas, Samaras and Stournaras are five of the Ten Officials.[1]

---

[1] Marks, Simon, *Drugs Scandal Roils Greek Politics* (May 30, 2018), available at:
https://www.politico.eu/article/greece-politics-novartis-scandal-pharmaceutical-whistleblower/, and

3

15. Mr. Sarakis, in violation of U.S. laws, disclosed to the Greek authorities the identities of Filistor Destempasidis, who is Whistleblower A, and Ms. Marangeli, but not of Mr. Salmas, who is Whistleblower B, and who is a close ally of the Prime Minister.

16. Mr. Salmas accepted bribes from Novartis and he then became a whistleblowers against the other nine of the Ten Officials, but not against himself.

17. The Five Officials, as well as the other five of the Ten Officials have claimed innocence, have denied accepting any bribes from Novartis, and have accused Mr. Destempasidis and Ms. Marangeli of slander and defamation.

18. With the consent of the Prime Minister, who has the final word on all matters under the Greek constitution, the Office of the Public Prosecutor has sued Mr. Destempasidis and Ms. Marangeli for providing "false" and "fabricated" information to the SEC, DOJ and FBI ("the U.S. Officials"), and slandering and defaming the Ten Officials[2].

19. The SEC, DOJ and FBI have extensively investigated the hard evidence provided by Mr. Destempasidis, Ms. Marangeli, Mr. Salmas, who is Whistleblower B, and Whistleblower C, have found that the evidence is valid.

20. Novartis has accepted that the $50 million was paid as bribes to the Ten Officials.

21. Mr. Destempasidis and Ms. Marangeli, under pressure and threats, have stated in court that the information they provided to the SEC was false, and the court has found them guilty of slander and defamation, has given them long prison terms and has seized all their assets,

---

Politics (no author named), *Novartis Case File Presented to Greek Parliament* (February 6, 2018) available at: https://www.amna.gr/en/article/228200/Novartis-case-file-presented-in-parliament-as-probe-continues.
[2] Newsroom (no author named), *Former Protected Witnesses in Novartis Case Convicted* (September 16, 2025), available at: https://www.ekathimerini.com/news/1280926/former-protected-witnesses-in-novartis-case-convicted/

including their portions of the Whistleblower Award[3].

22.    Given the course of action the Public Prosecutor has taken, the Five Officials, and probably the rest of the Ten Officials have already taken or will soon take, as compensation for having been slandered and defamed by Mr. Destempasidis and Ms. Marangeli, the portions of the Whistleblower Award that belong to Mr. Destempasidis and Ms. Marangeli, which is appr. $28 million, less what the Prime Minister has already taken, or will soon take as explained below.

23.    Based on information provided to Plaintiff, as indicated below, the Prime Minister, as head of the government, expects to receive or has already received a Lion's share from the portions of the Whistleblower Award that belong to Mr. Destempasidis an Ms. Marangeli.

24.    The Defendants have already taken or will soon take Destempasidis's portion of the Whistleblower Award. This act on the part of the Defendants transfers Plaintiff's claim against Destempasidis also against the Defendants.

25.    In addition, on October 3, 2023, Plaintiff had sent an email to the office of the Prime Minister to which he had attached copies of agreements between Plaintiff and the whistleblowers group, thus informing the Prime Minister of existing contractual relationships.

26.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for (a) tortious interference in the contractual relationship between Plaintiff and Mr. Sarakis, the Sarakis Law Firm, and Whistleblowers A, B and C, (b) Witness Tampering ( 18 U.S.C. § 1512), (c) violations of the Foreign Extortion Prevention Act (FEPA – 18 U.S.C. § 1352), (d)

---

[3] Stamatoukou, Eleni, *Greek Court Convicts Novartis Whistleblowers of False Testimony* (September 15, 2025), available at: https://www.ekathimerini.com/news/1280926/former-protected-witnesses-in-novartis-case-convicted/ and Newsroom (no author named), *Assets of former Protected Witnesses in Novartis Case, Maximos Sarafis and Aikaterini Kelesi, have been Seized* (November 27, 2025), available at: https://en.protothema.gr/2025/11/27/assets-of-former-protected-witnesses-in-novartis-case-maximos-sarafis-and-aikaterini-kelesi-have-been-seized/

dereliction of duty and/or (e) fraudulent enrichment and to recover damages resulting from the Defendants' actions.

## JURISDICTION AND VENUE

27.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 (d)(2) as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

28.     Personal jurisdiction exists over Defendants because Defendants have interfered with agreements which are under DC law and have violated U.S. laws as to render the exercise of jurisdiction over Defendants by this Court permissible under traditional notions of fair play and substantial justice.

29.     Venue is proper in this District under 28 U.S.C. § 1391, because the underlying contact which Defendants' actions have already affected or will soon affect is under the laws of the District of Columbia.

30.  If Plaintiff took legal action against Defendants in Greek court, Plaintiff would be arrested and jailed for slandering the Defendants, who not only have absolute immunity under Greek law, but control such law. This Court is the only venue in which justice may prevail.

## PARTIES

31.     Plaintiff Dr. George N. Naskaris was the founding member of the whistleblower group and a named party and/or signatory to the final contract between the parties. Dr. Naskaris is the founder and President of New York businesses  Greystone Ventures Group, Inc. ("Greystone Ventures") and Greystone Healthcare Group, Inc. ("Greystone Healthcare"), and among other things, former professor of Economics. Plaintiff was born into Greek peasantry, came to the U.S. on a student visa on Sunday, August 14, 1966, worked in restaurants and drove taxi through his undergraduate years at CCNY to support himself, and was able to complete his Doctorate in

6

Economics at the Graduate Center of the City University of New York through fellowships and teaching at CUNY's Baruch College. Plaintiff became U.S. citizen in 1976.

32.    Defendant Kyriakos K. Mitsotakis, is Prime Minister of Greece. Mr. Mitsotakis's late father, Konstantinos Mitsotakis, a career politician, was also Prime Minister of Greece, his grandfathers on both sides were career politicians. Members of Mr. Mitsotakis's immediate family have been and/or are mayors of Athens and/or members of the Greek Parliament. The Mitsotakis family is a Dynasty, and as such, it has been playing and plays a central role in Greek politics. No one can challenge the opinion and wishes of Mr. Mitsotakis. Mr. Mitsotakis is a graduate of Stanford University and has graduate degrees from Harvard University.

33.    Defendant Dimitris Avramopoulos is a career politician and scion of a wealthy and best known Greek family. In addition to the government offices he held in Greece, he was also a Commissioner of the European Union responsible for Immigration and Home Affairs.

34.    Defendant Antonis Samaras is a career politician and scion of one of the wealthiest and best known Greek families. Mr. Samaras is a graduate of Amherst College in Massachusetts.

35.    Defendant Adonis Georgiadis, is a career politician and scion of one of the wealthiest and best known Greek families.

36.    Defendant Yannis Stournaras, is a scion of one of the wealthiest and best known Greek families. Mr. Stournaras was educated in the UK and was a university professor. Mr. Stournaras was Finance Minister during the 2012-14 period when the International Monetary Fund (IMF) and European Central Bank (ECB) were restructuring the financial obligations of Greece pursuant to Greece's sovereign debt default of about $300 billion.

37.    Defendant Marios Salmas is a scion of a wealthy Greek family, a medical doctor and a career politician, close ally to the Prime Minister.

## RELATED PARTIES

38.    Andrew Beato ("Mr. Beato"), Partner at the Washington, DC, Stein, Mitchell, Cipollone, Beato and Missner law firm ("Stein Mitchell").

39.    Stephen Kohn (Mr. Kohn"), Man. Partner at the Washington, DC, Kohn, Kohn and Colapinto law firm ("KKC").

40.    Pavlos K. Sarakis ("Mr. Sarakis"), Member of the Greek Parliament

41.    Sarakis & Associates Athens, Greece, based law firm ("Sarakis Law Firm"), whose founder, owner and only partner is Mr. Sarakis.

42.    Whistleblower A, Filistor Destempasidis ("Mr. Destempasitis"), former senior level employee of Novartis, whose identity, in violation of U.S. laws, was disclosed to Greek Public Prosecutor by Mr. Sarakis.

43.    Whistleblower C, former employee of Novartis (his name has not appeared in any public statements or court documents and Plaintiff will keep him anonymous.

44.    Maria Marangeli ("Ms. Marangeli"), former P.A. of Novartis Hellas's President, whose identity, in violation of U.S. laws, was disclosed to Greek Public Prosecutor by Mr. Sarakis.

45.    Grigoris S. Dimitriadis ("Mr. Dimitriadis"), Athens based attorney, who is nephew of the Defendant, and who had been Chief of Staff of the Defendant until he was forced to resign due to a hacking and wiretapping scandal.

46.    Nancy, no last name available, P.A. of Mr. Dimitriadis.

## FURTHER SUBSTANTIVE ALLEGATIONS

47.    Dr. Naskaris has extensive experience doing business in the pharmaceutical, hospital, and healthcare industry in Europe. From 1996 through 2003, while working on hospital related projects in Greece, Dr. Naskaris came to learn of large-scale corruption and bribery

8

between the pharmaceutical companies, especially Novartis, and medical doctors, hospital personnel and highest level government officials.

48.    In 2003, Dr. Naskaris, on behalf of Greystone Healthcare, had initiated and structured a transaction between the largest German private hospital group, Asklepios Kliniken GmbH, whose sole shareholder and Chairman was the late Dr. Bernard gr. Broermann, and the largest Greek publicly traded hospital group, Athens Medical Center (www.iatriko.gr), whose largest shareholder and Chairman was Georgios Apostolopoulos ("Apostol").

49.    Apostol and Dr. Naskaris had agreed for a certain compensation for Greystone Healthcare for having structured the transaction and doing the due diligence work. Subsequently, Apostol tried to reduce Greystone Healthcare's compensation and Dr. Naskaris wouldn't accept it. Apostol told Dr. Naskaris that he was not interested in the transaction, but Apostol and Dr. Broermann completed the transaction, without paying Dr. Naskaris.[4]

50.    Subsequently, Dr. Naskaris informed the Greek Finance Ministry and Dr. Stavros Thomadakis, Chairman of the Greek Capital Markets Commission, overseer of the Athens Stock Exchange, of the corruption he had witnessed while doing the due diligence for the transaction, which included, among other violations, share price manipulation, conflict of interest, money laundering, tax evasion and using the police, or personal body guards dressed as policemen, to intimidate the public. Dr. Naskaris had known Dr. Thomadakis from the time Dr. Naskaris was Adjunct Professor of Economics at NYC's Baruch College and Dr. Thomadakis was professor of Finance there.

51.    In May of 2010, Dr. Naskaris had found out that Apostol had sued him behind his

---

[4]    Draft of Asklepios- Athens Medical Center Consultancy and Stock Option Purchase Agreement of September 17, 2003 attached hereto as Exhibit 1.

back and had obtained judgments against him using Atty. Zoi Konstantopoulou, a member of the Greek Parliament, who in 2015 became President of the Greek Parliament, as his attorney.

52.     In 2011, when Greece defaulted on about $300 billion of sovereign debt, Dr. Naskaris knew that most of that money had been stolen by Prime Ministers and other public officials in kickbacks and other corrupt schemes, including the bribing scheme that gave rise to the Novartis Case, and tried to find a way to bring one or more of the corrupt officials and bribing companies to a transparent venue to face justice, but he didn't know how and where.

53.     Sometime in 2012, Dr. Naskaris met Mr. Beato in order to discuss the corruption in Greece, and Mr. Beato had informed him that he could use the Foreign Corrupt Practices Act (FCPA) to make a case with the U.S. SEC and DOJ against Greek corrupt politicians and multinational bribing companies.

54.     As a result of the judgments Apostol had obtained against Dr. Naskaris, the latter couldn't go to Greece and in 2014, Dr. Naskaris, using information he obtained from the U.S. Consulate in Athens, contacted a number of Greek attorneys searching for an attorney who could help him take action, but of all the attorneys he had contacted, only Mr. Sarakis was interested and willing to take part in a case that involved bribes and corrupt politicians.

55.     One of the attorneys Dr. Naskaris had contacted on another potential FCPA case, during a WhatsApp call, in all seriousness, when asked why he couldn't work on a case that involved corrupt public officials, had responded "I don't want to end up dead in a ditch".

56.     On November 25, 2014, Dr. Naskaris, on behalf of Greystone Ventures, and Mr. Sarakis, on behalf of the Sarakis Law Firm, entered into a contract to investigate and develop a legal action concerning Greek pharmaceutical corruption and bribery practices, with Novartis as

the main target.[5]

57. The contract contained an Action Plan, confidentiality provisions, and a Non-circumvention clause that prevented either party from making agreements or taking unilateral action concerning the contemplated matters without the approval of the other.

58. Dr. Naskaris disclosed to Mr. Sarakis in confidence that the reason he needed an attorney in Greece to work with him was that Dr. Naskaris couldn't go to Greece because of the judgments Apostol had obtained against him. The information Dr. Naskaris provided to Mr. Sarakis was protected by the agreements they had signed.

59. Later on, when Dr. Naskaris explained to Mr. Salmas the corruption he had encountered in Greece and how he obtained his evidence against Novartis, Dr. Naskaris disclosed to Mr. Salmas the judgments Apostol had obtained against him. That disclosure was in confidence and was protected by the agreements Mr. Salmas had signed.

60. Together, Dr. Naskaris and Mr. Sarakis were able to identify and bring Whistleblower A on board to help build their case.

61. During this same time period, Dr. Naskaris introduced Mr. Sarakis to Mr. Beato, to serve as U.S. counsel and to help them bring their FCPA whistleblower case before the SEC.

62. On January 21, 2015, Dr. Naskaris, on behalf of Greystone Healthcare, Mr. Sarakis, on behalf of the Sarakis Law Firm, Mr. Beato, on behalf of Stein Mitchell, and Whistleblower A, as Executive, entered into a contract concerning the collective prosecution of an FCPA whistleblower action against Novartis.[6]

63. Therein, Dr. Naskaris and Whistleblower A codified their "Clients' Agreement"

---

[5]    The November 25, 2014 contract is attached hereto as Exhibit 2.
[6]    The January 21, 2015 contract is attached hereto as Exhibit 3.

as an agreement independent of legal representation, that the clients would split equally any contingent award that resulted from the contemplated whistleblower action, after attorneys' fees.

64.    Thereafter, the whistleblower group continued to work together to build their FCPA case against Novartis.

65.    As the founder and leader of the whistleblower group, Dr. Naskaris was essential in the inception and the development of this Novartis FCPA action. Through his knowledge and expertise in the European healthcare industry, Dr. Naskaris oversaw the identification and recruitment of additional primary witnesses to help fortify the factual allegations of the case with first-hand knowledge and documents, including Whistleblowers A, B, and C.

66.    On May 13, 2016, after the group successfully onboarded Whistleblower B and Whistleblower C, Dr. Naskaris, on behalf of Greystone Healthcare, Mr. Sarakis, on behalf of the Sarakis Law Firm, Mr. Beato, on behalf of Stein Mitchell, Whistleblower A, Whistleblower B, and Whistleblower C entered into an updated agreement to contractually incorporate Whistleblower C into their party.[7]

67.    The new agreement still contained an independent Clients' Agreement on fee sharing and defined everyone's share in terms of a total percentage of the potential whistleblower award, but altered the split so that:

   a. Stein Mitchell would receive 35%;
   b. The Sarakis Law Firm would receive 24%;
   c. Dr. Naskaris would receive 15%;
   d. Whistleblower A would receive 8%;
   e. Whistleblower B would receive 10%; and
   f. Whistleblower C would receive 8%

68.    For the next few months, the whistleblower group continued to work together and

---

[7]    The May 13, 2016 contract is attached hereto as Exhibit 4.

12

develop the Novartis FCPA case. Dr. Naskaris served and upheld his position as a consultant to the case and helped coordinate the group's efforts.

69.     On August 12, 2016, Stein Mitchell completed and filed the whistleblower group's TCR with the SEC that eventually led the successful prosecution of the Novartis FCPA actions and the payment of the Whistleblower Award.

70.     Shortly after filing the TCR, for reasons not explained to Plaintiff, Stein Mitchell reached irreconcilable differences with Mr. Sarakis and Whistleblowers A, B, and C concerning legal strategy and decided to withdraw from the case and forfeit any portion of the Whistleblower Award. However, since the clients' agreement to split the Whistleblower Award was made independent of Stein Mitchell's legal representation, the group fee split was still in effect.

71.     Following Stein Mitchell's withdrawal, Dr. Naskaris made it clear to the remaining whistleblower group that he was not withdrawing from the case.

72.     Thereafter, Mr. Sarakis, the Sarakis Law Firm, Whistleblowers A, B and C hired KKC as their U.S. counsel, without consulting or notifying Dr. Naskaris and continued to prosecute the whistleblower group's Novartis FCPA action without Dr. Naskaris.

73.     Upon information and belief KKC was aware of the whistleblower group's existing contract with Plaintiff.

74.     On June 25, 2020, the SEC and DOJ announced massive settlements of $345 million to resolve the Novartis FCPA matters.

75.     On February 9, 2021, Dr. Naskaris received a letter from the Criminal Division of the DOJ, which included a summons from a Greek court, ordering Plaintiff to appear in an Athens court two weeks later, February 23, at 9:00 am.

76.     On February 22, 2021, Charles Camp, Man. Partner of the eponymous DC based

law firm, acting on behalf of Dr. Naskaris, responded to the Greek court that given the Covid pandemic, it wouldn't be possible for Plaintiff to appear in court in Athens, and if anyone wanted to sue Dr. Naskaris, they could do so in DC court where he stood a fair chance to defend himself.[8]

77.     On or about May 17, 2022, Plaintiff received via FedEx a letter from the Criminal Division of the DOJ[9], which included judgments against him from a Greek court.[10]

78.     Subsequently, Plaintiff contacted a number of attorneys in Athens for advice on how to deal with the judgments.

79.     On December 29, 2022, Plaintiff had contacted Mr. Dimitriadis in relationship to judgments Mr. Sarakis, Mr. Salmas and Apostol had obtained in Greek court against Plaintiff, and received an immediate response from Mr. Dimitriadis.

80.     From December 29, 2022, through January 10, 2023 and later, Plaintiff, Mr. Dimitriadis and his PA, Nancy, had a number of communications via zoom, email, text messages and WhatsApp calls.

81.     On January 10, 2023, Plaintiff was expecting a call from Mr. Dimitriadis to decide on a meeting place and time, they had previously discussed, but instead, Plaintiff received a call from Nancy, who told him that Mr. Dimitriadis had spoken with his uncle, the Prime Minister, who had asked him not to work with Plaintiff because the Prime Minister has an economic interest in the Whistleblower Award.[11]

82.     On August 4, 2023, the SEC announced it was providing $104 million as the Whistleblower Award.

---

[8]     Letter from Atty. Charles Camp to Greek Court is attached hereto as Exhibit 5
[9]     Letter from the Criminal Division of the DOJ is attached hereto as Exhibit 6
[10]    Judgments document from Greek Court is attached hereto as Exhibit 7
[11]    A screenshot from a WhatsApp message is attached hereto as Exhibit 8

83. The Prime Minister is in control of $28 million; the portion of the Whistleblower Award that belong to Mr. Destempasidis and Ms. Marangeli.

84. On May 11, 2026, Dr. Naskaris sent a letter to the Prime Minister via email and registered post "Demanding" that the Prime Minister places the $54 million (or $56 million, depending on calculations) Whistleblower Award in an escrow account under the control of the U.S. Ambassador to Greece, so that a US judge decide on who should get paid.

85. Plaintiff had requested that the Prime Minister responds by June 4, 2026, but has received no response from the Prime Minister.[12]

86. Now Plaintiff brings this action seeking damages resulting from Defendants' tortious interference with an existing contract, Witness Tampering ( 18 U.S.C. § 1512), violations of the Foreign Extortion Prevention Act (FEPA – 18 U.S.C. § 1352), Dereliction of Duty and/or fraudulent enrichment.

## COUNT I

### Against Defendants for tortious interference with Plaintiff's Contract with Sarakis, Sarakis Law Firm and Whistleblowers A, B and C

87. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88. The Prime Minister had been informed that a valid contract existed between Plaintiff and Sarakis, Sarakis Law Firm, Whistleblower A, Whistleblower B, and Whistleblower C, and Plaintiff was owed 15% of the Whistleblower Award.

89. The Five Officials, by having already taken or will soon take the portions of the Whistleblower Award that belongs to Mr. Destempasidis, have tortiously interfered with the

---

12      Demand to Protect the $56 Million Whistleblower Award is attached hereto as Exhibit 9

claims Dr. Naskaris has against Mr. Destempasidis.

90. Plaintiff was damaged millions of dollars by the actions of the Defendants.

## COUNT II

### Against Defendants for Witness Tampering ( 18 U.S.C. § 1512)

91. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92. The Prime Minister's action, in cooperation with the Five Officials, by allowing the Office of the Public Prosecutor to take action against Mr. Destempasidis, and Ms. Marangeli, whose identities were protected by U.S. law, is witness tampering under ( 18 U.S.C. § 1512) and in violation of U.S. laws. The actions of the Defendants may render Plaintiff's effort to enforce any judgment he may obtain against Whistleblower A impossible. The fate of Whistleblower C is not known.

93. Plaintiff was damaged millions of dollars by the Defendants actions because they created an environment in which other corrupt politicians could act similarly.

## COUNT III

### Against Defendants for violations of the Foreign Extortion Prevention Act (FEPA - 18 U.S.C. § 1352)

94. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

95. Defendants use the Office of the Public Prosecutor to emotionally torment and threaten Mr. Destempasidis and Ms. Marangeli with imprisonment so that the latter would deny the truthfulness of the information they had provided to the US Officials and to claim that the information was fabricated have violated the Foreign Extortion Prevention Act (FEPA - 18 U.S.C. § 1352).

16

96. Defendants' actions irreparably hinder Plaintiff's effort to enforce any judgment he may obtain against Mr. Sarakis, Sarakis Law Firm, and Whistleblowers A, B and C.

97. Plaintiff was damaged millions of dollars by Defendants' corrupt actions because such actions allowed Mr. Sarakis to violate the agreements he signed, knowing that he can buy a seat in the Parliament for immunity, as he did, and/or use a "friendly" court to protect himself against any judgments.

## COUNT IV

### Against Defendant for Dereliction of Duty

98. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99. The Prime Minister, through the Greek Ministry of Justice or the Greek Ambassador to the U.S., could have contacted the SEC and DOJ in order to find out whether the evidence provided by Mr. Destempasidis and Ms. Marangeli against the Ten Officials was valid. Instead, Defendants allowed the Greek courts to prosecute Mr. Destempasidis and Ms. Marangeli for slandering the Five Officials, and thus allowing themselves the opportunity to claim part of the Whistleblower Award for damages.

100. Plaintiff was damaged millions of dollars by Defendants' dereliction of duty.

## COUNT V

### Against Defendant for Fraudulent Enrichment

101. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

102. Defendants would never have received or may receive any fraudulent enrichment, but for the actions of Plaintiff.

17

103. Therefore, as a result of Defendants' benefit at Plaintiff's expense, Defendants have been unjustly enriched.

104. Accordingly, equity and good conscience require that Defendants pay restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Entering judgment against Defendants for tortious interference with contract;

B. Entering judgement against Defendants Witness Tampering ( 18 U.S.C. § 1512);

C. Entering judgment against Defendants for violations of the Foreign Extortion Prevention Act (FEPA – 18 U.S.C. § 1352);

D. Finding that Defendants unjustly enriched himself at the expense of Plaintiff;

E. Awarding Plaintiff all of their compensatory damages and/or restitution to be proved at trial which Plaintiff has suffered as a result of Defendants' tortious interference with contract, witness tampering, violations of the FEPA, and/or unjust enrichment, plus pre-judgment and post-judgment interest and coasts;

   a. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and/or

   b. Granting such other and further relief as this Court may deem just and proper.

## DRAFTING OF COMPLAINT

Plaintiff has no legal training of any kind, and has personally prepared this Complaint through research and using Complaints from other cases he found as examples.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

18

Dated: July 1, 2026

Respectfully submitted personally – pro se,

George N. Naskaris, Ph.D.
c/o FGGK ADWOKACI
Ulica Borbowiecka 11A/L2
Warsaw 00-728, POLAND
e-Mail: georgen@thegreystones.com
        greystonesnyc@gmail.com

ADDRESSES OF DEFENDANTS

The Hon. Kyriakos Mitsotakis. Prime Minister
MEGARON MAXIMOU
19 IRODOU ATTIKOU STREET
ATHENS 10674, GREECE
PHONE: +30 210 338 5491


Dimitris L. Avramopoulos, Member of Parliament
GREEK PARLIAMENT
2 VASILISIS SOFIAS LEOFOROS
SYNTAGMA SQUARE
ATHENS 10021, GREECE
PHONE: +30 210 370 7000


The Hon. Adonis Georgiadis, Minister of Health
GREEK PARLIAMENT
2 VASILISIS SOFIAS LEOFOROS
SYNTAGMA SQUARE
ATHENS 10021, GREECE
PHONE: +30 210 370 7000


The Hon. Antonis Samaras, Member of Parliament
GREEK PARLIAMENT
2 VASILISIS SOFIAS LEOFOROS
SYNTAGMA SQUARE
ATHENS 10021, GREECE
PHONE: +30 210 370 7000


The Hon. Marios Salmas, Member of Parliament
GREEK PARLIAMENT
2 VASILISIS SOFIAS LEOFOROS
SYNTAGMA SQUARE
ATHENS 10021, GREECE
PHONE: +30 210 370 7000


The Hon. Yannis Stournaras, Chairman
BANK OF GREECE
21 EL. VENIZELOU STREET
ATHENS 10250, GREECE
PHONE: +30 210 320 1111